WINKE, Appellant, vs. OLSON and others, Respondents.

*November 16—December 5, 1916.*

*Infants: Right to inherit from foster-parents: Contracts: Construction: Specific performance.*

1. A contract under which it is claimed that a foster-child, not legally adopted, is entitled to the rights of an heir at law of the foster-parents should not be specifically enforced so as to give the child those rights unless, in its terms and meaning, such contract is so clearly established as to show, without room for fair doubt, that the parties to it intended the child to have the right of inheritance claimed.

2. Plaintiff's father, a widower, placed her in the care and keeping of one G. and his wife, pursuant to a written instrument by the terms of which they were to have her "forever and all her time and privileges," he promising on his part that they should "be the parents of said child," and they agreeing and binding themselves "to care for said child in a parental manner and to enjoy all of the privileges of a child as if born" to them, and "to do our utmost to care for her as if our own child." No promise was made therein to adopt the child, nor was any reference made to property rights. *Held,* that such instrument did not, either in itself or in the light of all the surrounding circumstances, contain a promise or clearly show an intention on the part of G. and his wife that the child should have the right to inherit their property.

3. The word "privileges," as used in said instrument, does not necessarily include the right of inheritance.

APPEAL from a judgment of the circuit court for Pierce county: JAMES WICKHAM, Judge. *Affirmed.*

Equitable action to recover the value of property, which plaintiff claims she became entitled to, under a contract whereby she was placed by her father with John Gilbert and his wife to be dealt with as their child. The issues presented for trial by the pleadings, and in respect to which evidence was produced, were passed upon by the circuit judge, as indicated by the findings upon which the judgment was rendered, which findings, so far as they need to be examined, are as follows:

1. Plaintiff, who was born April 28, 1878, is the daughter of Aliot and Maria Torgerson. The mother died August 17, 1880. The father was then in such poor circumstances that he placed his six children in the care of other persons.

2. John O. Gilbert and Maria, his wife, at the time last mentioned, were childless and lived on a farm near the Torgerson home. At their request, November 25, 1881, Mr. Torgerson placed plaintiff in the care of the Gilberts under a written instrument of which the following is a copy:

"This indenture, made and entered into this 25th day of November, A. D. 1881, by and between Aliot Torgerson, a widower residing in the town of Gilman, in the county of Pierce and state of Wisconsin, party of the first part, and John O. Gilbert and Maria O. Gilbert, wife of said John O. Gilbert, of the town of Martell, in county and state first aforesaid, party of the second part,

"Witnesseth, that the said party of the first part for a valuable consideration doth by these presents hereby let and surrender forever to the said parties of the second part my daughter, Mathilda Torgerson, being the youngest daughter and legitimate daughter with my wife, now deceased, known as Maria Torgerson, to have my said daughter Mathilda forever and all her time and privileges; which my said daughter was born on the 28th day of April, A. D. 1878, by my said wife, Maria Torgerson, during her and my marriage, and I do by these presents hereby relinquish all my right, title,

and interest to her my said daughter forever. And I further promise and agree that said parties of the second part shall after the date hereof be the parents of said child and be under their exclusive control forever and forever. And the said parties of the second part for themselves agree and bind themselves to care for said child in a parental manner and to enjoy all of the privileges of a child as if born by said party of the second part and will do our utmost to care for her as if our own child.

"In witness whereof the said parties hereto have hereunto set their hand and seal this day and year first above written.
                            "ALIOT TORGERSON.   (Seal.)
"Signed and sealed in presence of
      "B. M. Anderson.
      "Peter R. Albertson."
"State of Wisconsin, St. Croix County—ss.

"Be it remembered that on this 25th day of November, A. D. 1881, personally came before me the above named Aliot Torgerson, of the town of Gilman in the county of Pierce and state of Wisconsin, to me known, and known to me to be the person who executed the within instrument, and acknowledged the execution thereof to be his free act and deed for the uses and purposes therein mentioned.
                            "B. M. ANDERSON,
"(Notarial Seal.)   Notary Public, St. Croix, Wisconsin."

Thereafter the Gilberts treated plaintiff in all respects as their child while she remained with them. She believed they were her parents until she was ten years of age, when she learned who her parents were. She was known as Matilda Gilbert, and was confirmed in the church which the Gilberts attended as Matilda Torgerson Gilbert.

4. At the age of nineteen plaintiff left her home without the knowledge or consent of the Gilberts; but was induced to return the next day by Mrs. Gilbert. After about one year she again left her home as before and did not return until the death of Mr. Gilbert; though in 1900, at his request and expense, she attended school in Minnesota for three months. Thereafter, until Mr. Gilbert died, he and his wife corresponded with plaintiff in a friendly way, some-

times urging her to return home. After her marriage in 1902 they requested her and her husband to visit them. They often sent her presents of money and other things.

5. Mr. Gilbert died intestate January 13, 1909. His estate was probated in due course in the county court of Pierce county, Wisconsin,—such proceedings being duly had that February 8, 1910, the net estate consisting of $25 in money and some real estate situated in Milwaukee county, Wisconsin, were, in due form, assigned to Mrs. Gilbert as his only heir.

6. The Gilbert farm consisted of eighty acres of land in Pierce county, Wisconsin. The two were joint owners thereof from the time they acquired the property until September 18, 1889, when Mr. Gilbert conveyed his interest to Mrs. Gilbert. June 29, 1898, thereafter, they both joined in conveying the land to *Caspar Olson.* December 5th, thereafter, the land was duly conveyed by *Mr. Olson* and his wife to Mrs. Gilbert by quitclaim deed expressing one dollar as the consideration.

7. Mrs. Gilbert died intestate April 24, 1914. She was in poor health for some years theretofore. On that account, and particularly on account of her mental condition in February, 1909, she was placed under guardianship. Thereafter her real estate was duly converted into money. Substantially all property in possession of the administrator of her estate is a portion of the proceeds of the sale of the farm and no part, so far as appears, is proceeds of property she obtained from Mr. Gilbert's estate.

8. The defendants other than the administrator are the heirs at law of Mrs. Gilbert.

9. Prior to Mrs. Gilbert's death, plaintiff visited in the vicinity of her home but did not visit them. After Mr. Gilbert died she visited Mrs. Gilbert, and thereafter did so on three occasions in the course of three weeks, when Mrs. Gilbert was in a sanatorium at Hudson, Wisconsin, but did not correspond with her or with her guardian, or care for her.

On such facts the court concluded that plaintiff was not entitled to any relief under the contract as regards the property left by Mrs. Gilbert and dismissed the action with costs.

*W. G. Haddow,* attorney, and *Spencer Haven,* of counsel, for the appellant.

*John E. Foley,* for the respondents.

MARSHALL, J.  In a case of this kind, specific performance should not be decreed unless the contract, in its terms and meaning, is clearly established so as to show, without room for fair doubt, that the parties to it intended the child to have the right of heirship the same as if born to those taking it into their family.  No such right should be held to have been intended by a contract which is so ambiguous that a different meaning could be reasonably read out of it.  *Dilger v. Estate of McQuade,* 158 Wis. 328, 148 N. W. 1085; *Heath v. Cuppel,* 163 Wis. 62, 157 N. W. 527.  A large number of authorities on the subject, in general, will be found referred to in the report of *Heath v. Cuppel.*  The court there remarked that "In such cases the facts must not only be consistent with performance of such a contract, but must also be such that they cannot reasonably be harmonized with any other theory."  In *Kinney v. Murray,* 170 Mo. 674, 701, 71 S. W. 797, the supreme court of Missouri, speaking on the same subject, said:

"When, as in this case, and in consonance with this doctrine, a court of equity is called upon to establish and enforce a contract of this character, in the teeth of the statute of wills, and of the statute of frauds and perjuries, and to set aside the disposition of valuable property made in conformity with the requirements of those statutes, there is devolved upon the chancellor the gravest responsibility, perhaps, that ever attaches to his high office.  And nothing short of the inherent justice of the claim, supported by evidence that can be relied upon with the utmost confidence, proving the ex-

istence of the contract, its terms and conditions and a substantial and meritorious compliance therewith, with such certainty and definiteness as to leave no room for reasonable doubt, can ever justify the exercise of such an extraordinary prerogative."

The rule referred. to is very important here, as it seems quite certain the decision below was grounded on a conviction that it does not clearly appear that the agreement provided plaintiff should have the right of inheritance as to the property of the Gilberts. Unless that view is clearly wrong, the judgment must be affirmed.

The language of the writing is quite ambiguous, tested by the degree of clearness above indicated. Therefore we may look to such language and also to the circumstances characterizing the making of the agreement and apply such rules of construction as will aid in determining what the parties intended. The intention so indicated will control in the construction of the writing regardless of expressions which might, under some circumstances, convey a different meaning. That is a very familiar doctrine,—one which courts apply so often that it is quite elementary.

Following the words of agreement on the part of appellant's father, by which "all her time and privileges" were pledged to the Gilberts, and it was promised that she should be "their child and they her parents," are these words, indicating the scope of their obligations: "And said parties of the second part, for themselves, agree and bind themselves to care for said child in a parental manner and to enjoy all of the privileges of a child as if born by said party of the second part and will do our utmost to care for her as if our own child."

What does the word "privileges" mean? It is significant that the promise was not, expressly, that the child should have "all of the privileges of a child" of the Gilberts. If such words were used to express a condition of the agreement on their part, that they should enjoy all of the "privileges"

of a child born to them, in return for the care agreed to be afforded, that would be consistent with the language in the first part of the agreement that they should "have all the time and privileges of a child" born to them. In that view it would be a reasonable reading of the contract that the Gilberts agreed, in consideration of having the child in their family and the benefit of her society and services, to give her the same care as if born to them, and that it did not contemplate making any property provision for her or adopting her with the incidental right of heirship. If the word "privileges," when used the second time, should be regarded as having been employed to bind the Gilberts to accord to the child all the privileges of one born to them, and it is considered that it was so used, the meaning is still quite involved in obscurity. The word was used in such close connection with the pledge "to care for said child in a parental manner" and to care for her "as if our own child," as to seem to make the latter explanatory of the former. Full effect could be given to the language without holding that it was intended to include the right of inheritance.

True, as counsel for appellant contend, the words "care for her as their own child" and to enjoy all of the privileges of a child born to "the said party of the second part" were used with the intention of creating some obligation or duty on the part of the Gilberts; but whether such duty or obligation was intended to extend further than the care of the child in a parental manner is by no means certain. The word "privileges" was not a very apt word to use for the purpose of conferring the right of heirship. That is a real, a legal right, regulated by law, to be enjoyed subject to the conditions prescribed by statute. It is not a mere privilege. Counsel are in error in the claim that such word, as used, necessarily includes the right of inheritance. When we appreciate the care which persons ordinarily exercise in respect to disposing of their property, either in their lifetime or upon their de-

cease, some more definite language would seem to be required to accomplish it than such as could be well satisfied without including property advantages.

Turning to some of the most significant of the authorities relied upon by appellant's counsel, it seems that they are quite distinguishable from this case. In *Middleworth v. Ordway,* 191 N. Y. 404, 84 N. E. 291, the contract provided that the child should be entitled to "her dower right in the property of said first parties, the same as though she was their own legitimate offspring." The words "dower right" necessarily, as the court considered, referred to a right of some sort in property.

In *Martin v. Long,* 53 Neb. 694, 74 N. W. 43, there were articles of adoption providing, among other things, that the child should have $500 and "equal rights and privileges of children born in lawful wedlock." Those words, under the circumstances, were held to include the right of inheritance. The case hardly supports the idea that "privileges" in such a case would include, even under similar circumstances, the right of inheritance. But it should be noted that the words "rights and privileges" were not used with the explanatory feature we have here, suggesting that "privileges" pointed to the customary care which parents bestow upon their children as regards sustenance, home advantages, clothing, education, etc.

In *Crawford v. Wilson,* 139 Ga. 654, 78 S. E. 30, it was use of words, by the person taking the child, promising to "keep her as her own child and to adopt her as such, with all the rights of a child related to her as such by blood" which inclined the court to hold that the right of inheritance was promised. Here again we have the significant word "rights" and the absence of any explanatory feature.

In *Chehak v. Battles,* 133 Iowa, 107, 110 N. W. 330, the contract provided, expressly, for all the rights of an own child, including the right of inheritance.

In *Van Tine v. Van Tine* (N. J. Ch.) 15 Atl. 249, 1 L. R. A. 155, the contract expressly provided for property rights as was the case in *Peterson v. Bauer,* 83 Neb. 405, 119 N. W. 764; *Kofka v. Rosicky,* 41 Neb. 328, 59 N. W. 788; *Hespin v. Wendeln,* 85 Neb. 172, 122 N. W. 852; *Steele v. Steele,* 161 Mo. 566, 61 S. W. 815; *Winne v. Winne,* 166 N. Y. 263, 59 N. E. 832, and the cases in general where the subject was treated.

The case before us does not clearly satisfy the logic of any of the authorities cited to our attention, in favor of appellant, though it must be conceded that there is some language used, here and there, which might, under some circumstances, support a contrary view.

Turning to the situation the parties to the writing dealt with, we see much to suggest that the Gilberts did not intend to bind themselves to accord appellant the right of inheritance. She was, practically, a stranger to them,—not a relative, as was the case in many of the instances found in the books. There was nothing to move them, in advance of knowing how she would develop and treat them in the family relation, to promise that she should be their heir. That they, under the circumstances, should leave that to be determined in the future, promising only to give her the care which they would bestow upon an own child, was most natural. Ordinary prudence would have suggested that. Consistent therewith, they did not promise to adopt her. They did not refer to the subject of property, expressly, or by necessary inference. They did not use any such words as are commonly employed where the purpose is to promise property advantages. Mr. Gilbert appears to have been quite an intelligent man. He was an insurance agent as well as a prosperous farmer, and had, evidently, done considerable business. He, doubtless, knew what the legal adoption of a child meant, and that the written law provided therefor. The statutory method of adoption was not used, neither was the word "adop-

tion" or any equivalent word employed.    In lieu thereof, the words were used promising care in a parental manner and to enjoy the privileges of a child of their own, which, as we have said, could be satisfied without affording property rights. It is quite significant that appellant was not regularly adopted.    Such a circumstance has been regarded with such significance in some jurisdictions that it has been held that the right of heirship cannot be conferred by a person upon the child of another except in the manner provided in the written law where there is, as here, such law.    *Renz v. Drury,* 57 Kan. 84, 45 Pac. 71; *Shearer v. Weaver,* 56 Iowa, 578, 584, 9 N. W. 907; *Willoughby v. Motley,* 83 Ky. 297.

The circumstances of appellant's father were such that it was as much a favor to him for the Gilberts to take his child as it was to them to secure her presence in their family, leaving property matters out of view.    Their act was, practically, that of taking a dependent.    If property rights had been in contemplation, it would have been most natural for the Gilberts to have protected their interests, after appellant left them, by mutual wills, and by such means to have remembered some, at least, of their numerous relations.    That they did not, suggests that they had no thought that their property would go to appellant in the absence of a will.    That is in harmony with Mr. Gilbert's statement, testified to on the trial, that it was too bad appellant did not remain with them as she could have had the whole thing.

The circumstances referred to, and others, doubtless, aided the court below in construing the agreement as not including a promise that appellant should have the status of a child of the Gilberts, as regards the right of inheritance.    Other courts have been likewise moved, as indicated, by authorities cited to our attention, particularly *Baumann v. Kusian,* 164 Cal. 582, 129 Pac. 986.    There the child was taken in a charitable way under a promise that it should be treated in all

respects as the child of the takers, and it was held that the agreement did not impose any obligation to leave property to it.    We will not extend this opinion further by referring to authorities.    There are many which might be cited, but none we have examined satisfy us that the trial court was clearly wrong in deciding that the parties to the writing did not intend appellant to have the status of a child of the Gilberts as regards the right of inheritance; that the privileges which were promised extend further than care, home advantages, clothing, sustenance, education, parental regard, and the like.

We do not overlook the evidence that Mr. Gilbert and Mrs. Gilbert, as well, on some occasions, casually remarked that they intended appellant to have property advantages by reason of her being in their family.    That kind of evidence of sayings many years after they are claimed to have occurred, and under the circumstances characterizing them, in this case, is not very satisfactory.    The Gilberts may have thought to leave property to appellant.    That they did not suppose the writing, by itself, would accomplish it, is indicated by the remark of Mr. Gilbert before alluded to, and other circumstances.    On the whole case it is considered that the decision of the trial court that the writing does not show with sufficient clearness that property advantages were promised appellant to justify specific performance, should be approved.

*By the Court.*—The judgment is affirmed.